1 F.3d 1242
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
R.E. DAILEY & COMPANY, Plaintiff-Appellant,
v.
JOHN MADDEN COMPANY, LTD.; Detroit Development Group, Ltd.;
John Madden, Jr., jointly and severally; First National
Bank of Boston; Jefferson Street Properties, Inc.,
intervenors, Defendants-Appellees.
 No. 93-1058.
 United States Court of Appeals, Sixth Circuit.
 July 28, 1993.
 
 Before JONES and BATCHELDER, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff-Appellant R.E. Dailey & Company ("Dailey") appeals the dismissal of its claims for rescission of a Settlement Agreement and the district court's order that it release a construction lien. We affirm the decision of the district court.
 
 
 2
 * On July 27, 1987, Dailey entered into a Construction Contract with John Madden Company, Ltd. ("Madden Co."). Under the contract, for a guaranteed maximum price of $37,090,000, Dailey was to serve as general contractor relating to the construction of a twenty-eight story office tower and 636-space parking structure at 150 West Jefferson Avenue, Detroit, Michigan. The Construction Contract was amended on August 17, 1987. On August 28, 1987, Madden Co. assigned the Construction Contract to the Detroit Development Group, Ltd. ("DDG").
 
 
 3
 After construction began, disputes between the parties arose. Dailey, Madden Co. and DDG tried to settle these disputes by entering into a Settlement Agreement on October 28, 1989. Paragraph Two of the Settlement Agreement "converted [the Construction Contract] from a guaranteed maximum price contract to a lump sum contract in the amount of $50,000,000." J.A. at 54. Paragraph Three of the Settlement Agreement detailed how the payment of this lump-sum price was to be accomplished. First, on October 31, 1989, Madden Co. was to pay $4,096,344.48 to Dailey by wire transfer to bring the total amount paid as of October 31, 1989 to Dailey by Madden Co. and DDG up to $45,000,000. There is no dispute that this event actually occurred. The First National Bank of Boston (the "Bank") apparently advanced this money and concomitantly increased the loan amount owed by DDG.[1] Second,
 
 
 4
 [i]n payment for that portion of the Lump Sum Price which is in excess of $45,000,000, Dailey agrees to accept and does hereby accept a 33 percent limited partnership interest in DDG (the "Partnership Interest").... [T]he Madden [Co.] shall raise the sum of at least $94,000,000 for the benefit of DDG, by means of a mortgage or mortgages, the sale of interests in the Project or in DDG, entry into a joint venture, or otherwise, which sum shall be applied to pay costs of the Project and shall not be available for distribution to the partners[.] ... DDG may incur indebtedness in the amount of up to $94,000,000 to pay costs of the Project, and such indebtedness may be secured by a mortgage or mortgages on the Project in such amount....
 
 
 5
 Id. at 55-56 (Settlement Agreement, p 3(b)). On July 27, 1990, DDG and the Bank amended their Construction Loan Agreement to increase the principal amount of the construction loan from $89,000,000 to $94,500,000. See id. at 144-45 (Second Amendment to Construction Loan Agreement at 1-2).
 
 
 6
 Also as part of the Settlement Agreement, Dailey agreed that it would not file a construction lien on the property in question:
 
 
 7
 7. No Liens. Dailey will pay all costs and expenses in connection with the completion of the the [sic] Project including payment of all subcontractors and material suppliers performing work in connection with the Project. Dailey will not file nor permit to be filed any construction lien against the Project based on work performed or to be performed by Dailey or any subcontractor of Dailey hereunder or under the Construction Contract.... In the event a lien is so filed, Dailey will secure its release, by payment or securing an adequate bond, within twenty (20) days after the date Dailey is notified of the recorded filing.
 
 
 8
 Id. at 57.
 
 
 9
 Dailey claims that, following execution of the Settlement Agreement, it spent at least $5,000,000 completing the construction project, but has "never received any payment for the balance of its services by way of a partnership interest in DDG or otherwise." J.A. at 288 (Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, for Release of Lien and for Sanctions at 4).
 
 
 10
 On February 1, 1991, the Bank published a Notice of Foreclosure Sale as a result of failures to repay the construction loan. The foreclosure sale took place in March 1991. Jefferson Street Properties, Inc. ("JSP"), a wholly owned subsidiary of the Bank, purchased the property in question.
 
 
 11
 On April 15, 1991, Dailey filed a construction lien against the relevant property in the amount of $4,909,472.84. JSP obtained a bond to secure payment of the alleged obligation underlying Dailey's construction lien, which enabled JSP to sell the property to a third party.
 
 
 12
 On May 7, 1991, Dailey filed its Complaint against Madden Co., DDG, and John Madden, Jr. (a general and controlling partner in Madden Co. and DDG), jointly and severally (together, "Madden"), in the United States District Court for the Eastern District of Michigan. In the first two counts of the Complaint, Dailey sought rescission of the Settlement Agreement. In a third count, Dailey sought damages for breach of the Settlement Agreement. Dailey generally claimed that, "[u]nder the terms of the Settlement Agreement, Madden [Co.] was obligated to raise $94,000,000 for the benefit of DDG, which would have made Dailey's interest in DDG worth $5,000,000," and that "Madden has not raised the agreed upon $94,000,000 and Madden and DDG have not assigned Dailey an interest in DDG worth $5,000,000." Id. at 25 (Complaint, paragraphs 15, 19). In the first count of the Complaint, Dailey sought rescission for failure of consideration, or, "failure and inability of DDG and Madden [Co.] to perform their obligations under the Settlement Agreement." Id. at 26 (Complaint, p 23). In the second count, Dailey sought rescission for "innocent misrepresentation" Id. (Complaint at 5). Specifically, Dailey claimed that the "representations that Madden [Co.] and DDG made regarding Madden [Co.'s] ability to raise not less than $94,000,000 for the benefit of DDG were untrue[ ...; a]t the time Madden [Co.] and DDG made the representations, Madden [Co.] and/or DDG should have known that the representations were untrue[ ...;] Madden [Co.] and DDG made the representations with the intent that Dailey would act upon the representations by entering into the Settlement Agreement"; and Dailey relied on the representations to its detriment. Id. at 26-27 (Complaint, paragraphs 25-29).
 
 
 13
 On June 27, 1991, Madden filed a Motion for Summary Judgment, for Release of Lien and for Sanctions. On September 30, 1991, the district court granted the motion in part. It dismissed the claim for rescission
 
 
 14
 because [the Settlement Agreement] is unambiguous[,] because there is no tender as must be required if a party is to seek equity and the rescission of a contractual agreement, and because the agreement does not promise that a 33-percent limited partnership interest, which the plaintiff agreed to accept, must be worth more than 5 million dollars.
 
 
 15
 Id. at 463 (Transcript of Hearing on Defendants' Motion for Summary Judgment and Release of Lien [hereinafter S.J. Hearing Tr.] at 46). In addition, the district court ordered Dailey's construction lien discharged, stating:
 
 
 16
 The lien does essentially give the plaintiff total relief in the lawsuit without a showing of probability of prevailing or all of the other requirements of an injunction, a mandatory injunction at the commencement of a lawsuit. And paragraph 7 of the settlement agreement is a clear promise that Dailey would not place a construction lien on the party in the settlement of the disputes between those parties.
 
 
 17
 Id. at 464 (S.J. Hearing Tr. at 47).
 
 
 18
 On November 27, 1991, Dailey filed a Motion for Clarification and Reconsideration of the district court's orders. This motion was heard on February 10, 1992, and was denied. The district court filed its Order Granting Partial Summary Judgment and Release of Lien on March 12, 1992, in which the first two counts of the Complaint were ordered dismissed and Dailey's construction lien was ordered discharged.
 
 
 19
 On March 30, 1992, Dailey filed its Notice of Appeal of the March 12, 1992 order. On July 10, 1992, pursuant to a stipulation of the parties, the Bank and JSP were permitted by the district court to intervene as party defendants. On December 15, 1992, we dismissed Dailey's appeal for lack of jurisdiction. R.E. Dailey & Co. v. John Madden Co., No. 92-1397 (6th Cir. Dec. 15, 1992) (unpublished per curiam).
 
 
 20
 On December 30, 1992, Dailey voluntarily dismissed the third count of its Complaint and filed another Notice of Appeal. On January 27, 1993, we granted Dailey's motion to stay the district court's order during the pendency of this appeal.
 
 II
 
 21
 "An appellate court applies the same test as used by the district court in reviewing a motion for summary judgment." Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988).
 
 III
 
 22
 Dailey contends that the district court erred in determining critical provisions of the Settlement Agreement to be unambiguous. Dailey asserts that the following provision of the Settlement Agreement is indeed ambiguous:
 
 
 23
 [T]he Madden [Co.] shall raise the sum of at least $94,000,000 for the benefit of DDG, by means of a mortgage or mortgages, the sale of interests in the Project or in DDG, entry into a joint venture, or otherwise, which sum shall be applied to pay costs of the Project and shall not be available for distribution to the partners....
 
 
 24
 J.A. at 56 (Settlement Agreement, p 3(b)). More specifically, Dailey contends that the phrase, "shall raise the sum of at least $94,000,000," is susceptible to more than one interpretation. The interpretation that Dailey would like to prevail would equate that phrase with the phrase, "would supplant the existing construction loan with new financing at a lower interest rate." Dailey's Br. at 23.
 
 
 25
 This interpretation reflects the heart of Dailey's claims. Dailey maintains that, under the Settlement Agreement, Madden Co. was to obtain new (permanent) financing to cover the cost of the construction project, replacing the 11.5% interest rate of the Construction Loan between DDG and the Bank with the equivalent of a more favorable 8.625% rate (derived from the capitalization rate used in the calculation of the purchase price of the project as expressed in a Real Estate Contract between DDG and U.S. Investor's Services, Inc.--the purchase fell through). According to Dailey, continuing to finance the project at the 11.25% rate as opposed to an effective 8.625% rate would mean that any ownership interest in the project would most probably not see positive cash flow until 1995 at the earliest, and "Dailey would never have accepted an ownership interest under those circumstances." Id. at 8. In Dailey's view, since Madden Co. failed to obtain such new financing, it materially breached the Settlement Agreement such that rescission is a proper remedy.
 
 
 26
 Appellees respond that the phrase at issue is unambiguous on its face:
 
 
 27
 For Dailey to suggest that the Settlement language it quotes ... required DDG to replace the Bank of Boston construction loan with a loan at a substantially lower interest rate defies comprehension. The only number mentioned is the amount of the loan. The only restriction placed on that number is that it may not be available for distribution to the partners. There is no reference to, let alone restriction on, the interest rate.
 
 
 28
 If Dailey had wanted Madden [Co.] to obtain permanent or new financing of $94,000,000, it would have been easy enough for the parties to include those words in the Settlement Agreement.
 
 
 29
 Appellees' Br. at 19-20. Appellees maintain that "Madden [Co.] complied with the plain language of the Settlement Agreement when it raised the $94,000,000 from the Bank, 'by means of a mortgage,' and used the money 'to pay the costs of the Project.' Madden [Co.] kept the promise it made." Id. at 17.
 
 
 30
 The district court accepted Appellees' argument. It held:
 
 
 31
 Well, the Court finds that the contract of settlement, the settlement agreement, is plain and unambiguous on its face, and refuses to examine the extrinsic evidence which is offered to interpret it as plaintiff requests here.
 
 
 32
 The contract provides, "The Madden [Co.] shall raise the sum of at least 94 million dollars for the benefit of DDG, by means of a mortgage," and so forth, "which sum shall be applied to pay the costs of the project."
 
 
 33
 The claim for rescission is dismissed, or summary judgment is granted on the claim for rescission of this agreement, because it is unambiguous ... and because the agreement does not promise that a 33-percent limited partnership interest, which the plaintiff agreed to accept, must be worth more than 5 million dollars.
 
 
 34
 J.A. at 462-63 (S.J. Hearing Tr. at 45-46).
 
 
 35
 We agree with the district court that the phrase at issue in the Settlement Agreement is unambiguous.[2] Dailey's proposed interpretation of the phrase tortures the wording of the Settlement Agreement. There is no mention of replacement financing. There is no mention of an effective 8.625% interest rate. According to the unambiguous terms of the Settlement Agreement, at least ninety-four million dollars were to be raised to pay costs of the project. Such money was raised.[3] Thus, Dailey's allegation in its Complaint that "Madden [Co.] has not raised the agreed upon $94,000,000," J.A. at 25 (Complaint, p 19), is without basis. Dailey's only other allegation of breach of the Settlement Agreement in the Complaint is that "Madden [Co.] and DDG have not assigned Dailey an interest in DDG worth $5,000,000." Id. Even if this allegation is true, such fact cannot constitute a breach. As the district court noted, the unambiguous terms of the Settlement Agreement provide only for a transfer of a 33% interest in the project, not an interest which is necessarily worth $5,000,000. Since there was no requirement that an interest worth $5,000,000 had to be transferred, there was no breach if an interest worth $5,000,000 was not in fact transferred. Since, from the relevant record, it is clear that Dailey can sustain neither of its allegations of material breach in its Complaint, the district court did not err in granting summary judgment on the rescission claims.
 
 IV
 
 36
 The district court, in addition to dismissing the two rescission claims in the Complaint, ordered that the construction lien filed by Dailey be discharged. Madden had sought such relief in its Motion for Summary Judgment, for Release of Lien and for Sanctions. Dailey appeals that portion of the district court's decision as well. We affirm the order of the district court.
 
 
 37
 Dailey argues that, to the extent that the district court found that the terms of the Settlement Agreement precluded Dailey from filing its construction lien, the district court's finding is erroneous because those terms are unenforceable under Michigan's Construction Lien Act (the "Act"), Mich.Comp. Laws Ann. Secs. 570.1101 to 570.1305 (West Supp.1993). According to Payment Application No. 23 (referenced in the Settlement Agreement, p 3(a)), construction work had been completed as of October 2, 1989 totalling a contract price of $45,636,534. Dailey contends that, since the contract price under the Settlement Agreement was set at $50,000,000, approximately $4,336,466 worth of construction work was left to be performed after the date of execution of the Settlement Agreement. With this as a context, the "No Liens" paragraph of the Settlement Agreement reads:
 
 
 38
 Dailey will not file nor permit to be filed any construction lien against the Project based on work performed or to be performed by Dailey or any subcontractor of Dailey hereunder or under the Construction Contract or the Tenant Improvements Contract.
 
 
 39
 J.A. at 57 (Settlement Agreement, p 7) (emphasis added). The Act, however, does not permit waivers of liens obtained in advance of work performed:
 
 
 40
 A person shall not require, as part of any contract for an improvement, that the right to a construction lien be waived in advance of work performed. A waiver obtained as part of a contract for an improvement is contrary to public policy, and shall be invalid, except to the extent that payment for labor and material furnished was actually made to the person giving the waiver. Acceptance by a lien claimant of a promissory note or other evidence of indebtedness from an owner, lessee, or contractor shall not of itself serve to waive or discharge otherwise valid construction lien rights.
 
 
 41
 Mich.Comp. Laws Ann. Sec. 570.1115(1) (emphasis added). Thus, in Dailey's view, the lien waiver provision in the Settlement Agreement referencing work to be performed is void for public policy reasons. Since it is void, the district court erred insofar as it held that Dailey was barred by its terms from filing a construction lien.
 
 
 42
 Appellees respond, inter alia, that Dailey is estopped from filing a construction lien against the project because loan proceeds were advanced in reliance on the absence of liens. They note that the Act further provides:
 
 
 43
 A waiver of a lien under this section shall be effective when a person makes payment relying on the waiver unless at the time payment was made the person making the payment has written notice that the consideration for the waiver has failed.
 
 
 44
 Mich.Comp. Laws Ann. Sec. 570.1115(6). The Michigan legislature considered why such a provision might be important as part of its revision of Michigan's Mechanics' Lien Act of 1891:
 
 
 45
 Lenders who have financed major construction projects in return for mortgages often discover too late that they have loaned money on titles clouded by the emergence of unrecorded mechanics liens. According to the law revision commission, legal remedies have been inadequate to prevent lenders from incurring substantial losses when property owners default, particularly when construction has not been completed. Thus, banks and other lenders are reluctant to finance construction mortgages unless they receive large fees and substantial interest to compensate them for their risks. Since it is not possible to raise fees and interest rates arbitrarily, construction lenders have attempted to place the burden of risk on insurers by insisting that the insurers guarantee the lender's priority of payment over those of potential lien claimants. Because title insurers have themselves incurred losses, they have begun to insist on high rates and severe restrictions that make lending difficult for financial institutions. These uncertainties all arise from ambiguities of the present lien law, and have contributed to the unavailability of construction funds.
 
 
 46
 First Analysis [-] Construction Lien Act, [Michigan] Senate Analysis Section, at 2 (Dec. 9, 1980); Third Analysis [-] Construction Lien Act, [Michigan] House Legislative Analysis Section, at 1 (Jan. 26, 1981). The Bank relied on the waiver of liens in increasing its loan disbursements to DDG. As the Bank and JSP wrote in their Brief in Support of [Their] Motion to Intervene (at 2):
 
 
 47
 The provision in the Settlement Agreement that is without doubt most important to the Bank is the provision in which the General Contractor agreed that it "will not file nor permit to be filed any construction lien against the Project." Without the prospect of any construction liens, the Bank's mortgage has the highest priority in the event of default. The Bank, in amendments to the Construction Loan Agreement, increased the construction loan from $69 million to $94.5 million. Therefore, the Bank advanced over $25 million based, in part, upon the Settlement Agreement and the "No Liens" paragraph.
 
 
 48
 J.A. at 394 (footnote omitted). While the exact amount of the increase in the construction loan made in reliance on the provisions of the Settlement Agreement is disputed, the record evidence indicates that such increase was indeed several million dollars. At the time the relevant payments were made, the Bank did not have written notice that the consideration given for the waiver of liens had failed.
 
 
 49
 We agree with Appellees that, by the unambiguous terms of the Settlement Agreement, Dailey agreed not to file construction liens against the relevant property. See id. at 490 (Transcript of Hearing on Plaintiff's Motion for Clarification and Reconsideration [hereinafter C & R Hearing Tr.] at 24) (counsel for Dailey: "I know that we contractually agreed not to lien the property. The Court knows that a contractor has a statutory right in Michigan to file a construction lien. That statutory right that we had we waived by reason of entering into the settlement agreement....").[4] This agreement was violated by the filing of the construction lien. The district court did not err in ordering the discharge of the lien.
 
 V
 
 50
 Finding Dailey's other arguments to be without merit, we AFFIRM the decision of the district court dismissing Dailey's rescission claims and ordering Dailey to discharge its construction lien.
 
 
 51
 BATCHELDER, Circuit Judge, concurring in the judgment.
 
 
 52
 In its complaint, Dailey outlined (broadly) three claims. The first two angled for rescission of the settlement agreement, and the third claimed breach. First, Dailey claimed that "[t]he failure and inability of DDG and Madden [Co.] to perform their obligations under the Settlement Agreement constitutes a complete failure of consideration." Second, it claimed to be a victim of "innocent misrepresentation": while inducing reliance on Dailey's part, Madden could not, at the time of the execution of the agreement, "raise not less than $94,000,000" as promised, and Madden, and DDG, "should have known the representations were untrue." Third, Dailey claimed Madden "breached the Settlement Agreement by not raising [the] $94,000,000 ... and Madden and DDG breached the Settlement Agreement by not assigning Dailey an interest in DDG worth $5,000,000." In order to render appealable the District Court's partial grant of summary judgment in favor of defendants, Dailey dismissed its third claim. Thus, the only question before us is whether Dailey has established any grounds for the District Court to rescind the Settlement Agreement. Like the majority, I think the simple answer is "no." However, I think Michigan law permits us to dispose of this case with much less ado.
 
 
 53
 A party to a settlement agreement seeking to escape the strictures of that document bears a heavy burden indeed. As do courts in general, the Michigan Supreme Court recognizes "the general rule that the law favors settlements" since " 'the very essence of a release is to avoid litigation, even at the expense of a strict right.' " Stefanac v. Cranbrook Educ. Community, 435 Mich. 155, 458 N.W.2d 56, 60 (1990) (quoting Kirl v. Zinner, 274 Mich. 331, 334 (1936)). Of course, "[s]ettlements are contracts and are governed by the legal principles of contracts." Hisaw v. Hayes, 133 Mich.App. 639, 350 N.W.2d 302, 303 (1984).
 
 
 54
 1. Ambiguity in the settlement agreement.
 
 
 55
 As the majority notes, Dailey's argument revolves around its insistence that what "raising $94 million" meant was that Madden Co. would refinance the entire deal at a lower rate, and obtain additional loans at this rate, the amount financed ultimately totalling $94 million. Dailey's problem is that the contract doesn't say anything about lower interest rates, new money, or the like; therefore Dailey says the contract is ambiguous. I agree with the majority; it isn't. But the majority suggests that Judge Taylor "may have erred by refusing to examine extrinsic evidence to determine whether in fact an ambiguity exists where the phrase in question 'may' be ambiguous." Slip op. at 9 n. 2. In some cases, the court should examine extrinsic evidence to ferret out potential ambiguity, as the cases cited by the majority hold. However, this Settlement Agreement included a standard integration clause, declaring the document and appended papers to be
 
 
 56
 the complete agreement between the parties.... There are no representations, warranties, covenants, conditions, terms, agreements, promises, understandings, commitments, or other arrangements other than those expressly set forth[.]
 
 
 57
 Michigan law comports with most other jurisdictions in prohibiting the admission of extrinsic evidence to determine latent ambiguity where such a clause appears:
 
 
 58
 When two parties have made a contract and have expressed it in a writing which they have both assented to as being the complete and accurate integration of that contract, then extrinsic evidence of antecedent or contemporaneous understandings and negotiations is not admissible for the purpose of varying or contradicting the writing.
 
 
 59
 Kassin v. Arc-mation, Inc., 288 N.W.2d 413, 415 (Mich.App.1979). I therefore believe Judge Taylor correctly excluded extrinsic evidence in finding, as the majority ultimately concluded, the disputed contract provision to be unambiguous. While it appears from the record that everyone involved expected the sale of the building to third parties not to fall through, whatever refinancing Dailey might have expected in connection with this sale, or with the completion of the building, cannot be read into the contract now. If the entire value of Dailey's claimed $5 million interest hinged on this refinancing, then Dailey should have ensured that the Agreement specifically said so. As is so typical in these cases, "such covenant[s] could have easily been expressly provided." Florida Canada Corp. v. Union Carbide, 280 F.2d 193, 196 (6th Cir.), cert. denied, 364 U.S. 902 (1960).
 
 
 60
 2. Grounds for rescission.
 
 
 61
 The majority affirms the District Court's dismissal of the rescission claims on the grounds that "Dailey can sustain neither of its allegations of material breach." Slip Op. at 10. However, I think Judge Taylor was correct in not even addressing Dailey's arguments in this regard, since, as she pointed out from the bench, Dailey had not tendered the consideration it had received under the Agreement prior to seeking its rescission. Again, Michigan law has not wavered from traditional maxims:
 
 
 62
 Rescission, whether legal or equitable, is governed by equitable principles, one of which is that an essential prerequisite to the receipt of such relief is the return of what has been received, or its equivalent, by him who seeks the remedy.
 
 
 63
 Carey v. Lauhoff, 310 Mich. 195, 3 N.W.2d 61, 67 (1942). See also Carey v. Levy, 329 Mich. 458, 45 N.W.2d 352, 355 (1951); Grabendike v. Adix, 335 Mich. 128, 55 N.W.2d 761, 767-68 (1952); Stefanac, 458 N.W.2d at 60; Hisaw, 350 N.W.2d at 303.
 
 
 64
 Dailey claims weakly that the over four million in cash it accepted under the terms of the Agreement "was indisputably owed," ignoring not only the fact that the Agreement saved Dailey from having to litigate to get the money it was "indisputably owed," but also that the Agreement, by its own terms, "supersede[d] all prior negotiations and agreements."[1] To free itself from a contract by claiming rescission, a plaintiff must tender all it has received by that contract, and place the entire matter in the hands of the court for equitable resolution.[2] Were this not required, plaintiff would be able to "take his chances of recovering in this action without running the risk of losing what he has received in case he is defeated." Carey v. Levy, 45 N.W.2d at 355 (quoting Morris v. Great Northern R. Co., 67 Minn. 74, 69 N.W. 628, 629 (1896)). Alone, Dailey's failure to ante up the money it received dooms its claims for rescission.
 
 
 65
 3. Enforceability of the construction lien.
 
 
 66
 I think this last issue, too, is easily disposed of under Michigan law. As the majority notes, a Michigan statute prohibits, "as part of any contract for improvement," the waiver of construction liens "in advance of work performed." Mich.Comp. Laws Ann. Sec. 570.1115(1). First, I think that this statute clearly states its scope, application, and effect; I strongly differ with the majority's examination of the statute's legislative history to illuminate further its already plain meaning. See, for example, I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 452-53 (1987) (Scalia, J., concurring in the judgment) (describing "the venerable principle that if the language of the statute is clear, that language must be given effect--at least in the absence of a patent absurdity").
 
 
 67
 Second, I do not believe the statute applies to this settlement contract. While the Settlement Agreement provided the means by which the building might be completed without courtroom fuss, it cannot be reasonably considered a "contract for improvement." Both parties agree the building was almost finished; more importantly, Dailey was paid for its work. The Agreement specifically provided that "Dailey agrees to accept and does accept a 33 percent limited partnership interest in DDG."[3] (emphasis added). By its own terms, the statute applies "except to the extent that payment for labor and material furnished was actually made to the person giving the waiver." Sec. 570.1115(1). Dailey was free to waive its right to impose construction liens on the building, prospectively as well as retrospectively;[4] as general contractor, it did so (and, indeed, assumed responsibility and liability for any liens imposed by its subcontractors), and it must be held to its promise. For this reason, I agree with the majority in affirming the District Court's discharge of the lien.
 
 
 68
 For the reasons I have described, I concur with the majority's judgment.
 
 
 
 [1]
 The Bank had previously loaned DDG the money to finance the construction project at a rate of 11.5% pursuant to a Construction Loan Agreement dated August 28, 1987
 
 
 [2]
 We note that the district court may have erred by refusing to examine extrinsic evidence to determine whether in fact an ambiguity exists where the phrase in question "may" be ambiguous. Goodwin, Inc. v. Coe, 220 N.W.2d 664, 669, 671 (Mich.1974) ("the detection of an ambiguity requires admissibility of extrinsic evidence to prove it"; "[w]here ambiguity may exist in a contract, extrinsic evidence is admissible to prove the existence of ambiguity") (emphasis added); see also McCarty v. Mercury Metalcraft Co., 127 N.W.2d 340, 344 (Mich.) ("[s]ince the detection of latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity"), cert. denied, 380 U.S. 952 (1965). It is not entirely clear from the district court's statement that it was refusing "to examine the extrinsic evidence which [was] offered to interpret [the Settlement Agreement] as plaintiff request[ed]," J.A. at 463 (S.J. Hearing Tr. at 46), whether the district court was refusing to examine extrinsic evidence tending to prove or disprove the existence of a latent ambiguity because the phrase could not be ambiguous, or whether the district court was refusing to examine extrinsic evidence tending to interpret the phrase, after having found that the phrase was not in fact ambiguous. Upon de novo review of the record, we find that, even if the district court erred by not examining extrinsic evidence tending to prove or disprove the existence of a latent ambiguity, such examination would have led to the only reasonable conclusion that, in fact, no ambiguity exists
 
 
 [3]
 Dailey contends that there is a genuine issue of fact as to whether Madden Co. ever raised the required amount, even under district court's interpretation of the Settlement Agreement. As noted above, however, on July 27, 1990, DDG and the Bank amended their Construction Loan Agreement to increase the principal amount of the construction loan from $89,000,000 to $94,500,000. See id. at 145 (Second Amendment to Construction Loan Agreement, Sec. 2.1(b)) ("The definition of the original principal amount of the Note set forth in the final recital to the Loan Agreement is amended to read 'NINETY-FOUR MILLION, FIVE HUNDRED THOUSAND DOLLARS ($94,500,000.00) (the 'Note')'."); cf. id. at 394 (Brief in Support of Jefferson Street Properties & First National Bank of Boston's Motion to Intervene at 2) ("The Bank, in amendments to the Construction Loan Agreement, increased the construction loan from $69 million to $94.5 million."). Dailey has put forth no evidence and otherwise points to nothing in the relevant record that contradicts the fact that the "original principal amount" of $94,500,000 was raised for the project. Dailey notes that, as of March 1, 1991, DDG owed the Bank $89,952,222 in principal, and $8,014,194 in accrued interest for a total of $97,966,416. Id. at 91 (Settlement Agreement [between Madden (and others) and the Bank] at 1). But this does not contradict the fact that an "original principal amount" of $94,500,000 was raised as of an earlier date
 
 
 [4]
 We note that Dailey did not argue at either the Hearing on Defendants' Motion for Summary Judgment and Release of Lien or the Hearing on Plaintiff's Motion for Clarification and Reconsideration that Michigan's pre-work lien waiver provision voids the relevant provision of the Settlement Agreement. Rather, in the latter hearing, for example, Dailey frankly admitted that it had waived its statutory right to file a lien,
 but we claim that we were induced to enter into this based upon certain things happening, and those things didn't happen.
 Thus, we lost, no consideration was provided to us, and so, therefore, what we're saying is that give us our lien right back that we gave up pursuant to the settlement agreement.
 And I'm saying I've got to file it now because if I don't do it now, then the statutory time requirements of the Michigan statute will run and bar our right to that lien irretrievably, even if I win on appeal, I'm a loser, and that's why I'm requesting the Court to reconsider that issue. I just think in fairness that we ought to be able to pursue that in this case.
 J.A. at 490-91 (C & R Hearing Tr. at 24-25).
 
 
 [1]
 As for the money's being "indisputably owed," I note that Dailey claims to have been "owed" $45 million for work which Dailey originally agreed to complete for a little over $37 million
 
 
 [2]
 Michigan courts recognize only two exceptions: one, where the defendant has waived this duty, which certainly has not occurred here, and two, in the case of fraud in the execution, which Dailey has never alleged. See Stefanac, 458 N.W.2d at 60
 
 
 [3]
 Dailey argues that it never received its partnership interest; however, the record shows that the paperwork evidencing the assigned interest was not "executed and delivered" to Dailey, at least in part because Dailey imposed the construction lien in violation of the specific provisions of the Agreement detailing the conditions of such delivery upon proof that the construction was indeed complete, and that no liens had been imposed
 
 
 [4]
 While no Michigan case specifically holds that Sec. 570.1115(1) permits waiver of the right to impose future construction liens on property during construction, the plaintiff builder in Durant Construction, Inc. v. Gourley, 336 N.W.2d 856 (Mich.App.1983) agreed to do so for consideration; the court rejected its argument that its waiver only applied to work already completed. Id. at 859