RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0047p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS,
THE GRAND TRAVERSE BAND OF OTTAWA AND
CHIPPEWA INDIANS, THE KEWEENA BAY INDIAN
COMMUNITY, THE BAY MILLS INDIAN COMMUNITY,
THE LAC VIEUX DESERT BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS, and THE SAGINAW CHIPPEWA
TRIBE OF INDIANS,

Nos. 05-2146/2603

*Plaintiffs,*

HANNAHVILLE INDIAN COMMUNITY,

*Plaintiff-Appellant,*

*v.*

JENNIFER GRANHOLM, Governor, Public Officer,
Successor in Interest Party,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 90-00611—Gordon J. Quist, District Judge.

Argued: November 2, 2006

Decided and Filed: January 30, 2007

Before: CLAY and ROGERS, Circuit Judges; KATZ, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Anthony Mancilla III, HANNAHVILLE INDIAN COMMUNITY, Wilson, Michigan, for Appellant. Todd B. Adams, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Anthony Mancilla III, HANNAHVILLE INDIAN COMMUNITY, Wilson, Michigan, Paul W. Shagen, RAYMOND & PROKOP, Sault Saint Marie, Michigan, for Appellant. Todd B. Adams, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

[*]The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

CLAY, J., delivered the opinion of the court, in which ROGERS, J., joined.  KATZ, D. J. (p. 10), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.  Plaintiff Hannahville Indian Community  ("Plaintiff Hannahville") appeals the district court's grant of a Motion to Enforce Stipulation and Consent Judgment in favor of the Governor of the State of Michigan ("Defendant") pursuant to Fed. R. Civ. P. 7 and 54.  For the reasons set forth below, we **REVERSE** the district court's decision and **REMAND** to the district court to resolve ambiguous terms in the Stipulation and Consent Judgment with the aid of extrinsic evidence.

**BACKGROUND**

**I.     Factual History**

On October 17, 1988, the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq*., was signed into law.  The purpose of the IGRA was to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1).  Almost immediately after the passage of the Act, Plaintiffs Hannahville, Sault Ste. Marie Tribe of Chippewa Indians, the Grand Traverse Band of Ottawa and Chippewa Indians, the Keweena Bay Indian Community, the Bay Mills Indian Community, the Lac Vieux Desert Band of Lake Superior Chippewa Indians, and the Saginaw Chippewa Tribe of Indians (collectively "the Tribes") began engaging in negotiations with Defendant to enter into an agreement that would govern the operation of class III games ("slot machines") on the Tribes' native lands.  Disagreements about the scope of the IGRA led to a breakdown in these negotiations and subsequently to a suit filed in the district court by the Tribes alleging that Defendant refused to negotiate gaming compacts as was required by the IGRA.  On August 20, 1993, the parties reached an agreement with respect to that claim, which was memorialized in a Stipulation and incorporated into a Consent Judgment.

The Stipulation and Consent Judgment set forth guidelines as to how the Tribes would operate their Michigan casinos.  The district court retained jurisdiction to enforce the Consent Judgment.  One of the terms of the Consent Judgment was that the Tribes agreed to "make semi-annual payments to any local unit of state government in the immediate vicinity of each tribal casino in the aggregate amount equal to two percent (2%) of the net win at each casino derived from all class III electronic games of chance."  (J.A. at 76-77).  The term "net win" was defined in the Stipulation.  Specifically it stated: "'[n]et win' is defined as the total amount wagered on each electronic game of chance, minus the total amount paid to players for winning wagers at said machines."  (J.A. at 69).

Plaintiff Hannahville owns and operates the Island Resort and Casino ("the Island Casino") in Harris, Michigan.  Around 1998, the Island Casino began producing and distributing promotional tokens to customers, which were good for a free play on the promotional slot machines.  The tokens, called QuickSilver tokens, were given out to customers completely free of charge.  Such "comps" are standard at casinos and are often used for marketing and promotional purposes.  The QuickSilver tokens could only be used while playing the QuickSilver slot machines.  The QuickSilver machines accepted only those tokens, and the tokens themselves could not be redeemed for real money.  The QuickSilver machines did, however, pay out in real money: One "credit" on a QuickSilver machine was denoted as a quarter, and the machines paid quarters to patrons when they won.

While the tokens were not redeemable for cash, there was some discrepancy with respect to how they were valued. In its Daily Revenue Report, which was an internal record kept to keep track of the casinos profits and losses, Plaintiff Hannahville valued QuickSilver tokens at twenty-five cents. Further, the Island Casino advertised their distribution of comps, and afforded them a dollar value in those ads, though there is some discrepancy as to whether those ads were referring to QuickSilver tokens or some other promotional wager program at the casino.

At the time Plaintiffs and Defendant entered into the Consent Judgment, the Island Casino had no promotional wagering programs in place, and accordingly, the Consent Judgment made no mention of how the casino should calculate net win with respect to promotional wagers. According to the Stipulation and Consent Judgment, the Island Casino is required to pay 2% of its net win to Defendant. A dispute arose over how to value the promotional tokens when calculating net win. Defendant argued that they should be valued at twenty-five cents, but Plaintiff Hannahville decided that the tokens should be valued as a zero cent wager. However, because the QuickSilver machines paid out in quarters, the money won by patrons on these machines was reflected in the net win calculus. The effect was that the QuickSilver machines consistently showed no money being wagered, but money being paid out. Thus, Plaintiff Hannahville's practice of assigning the tokens a zero cent value resulted in these machines necessarily producing a net loss. Because net wins are calculated across the entire floor of a casino and not on a machine by machine basis, this method of calculation lowered the Island Casino's overall profits and, accordingly, it lowered the amount Plaintiff Hannahville was required to pay Defendant.

## II.    Procedural History

Defendant filed a Motion to Enforce the Stipulation and Consent Judgment on January 25, 2005. There were originally three issues Defendant raised in the motion: "1) the calculation of 'net win' from promotional wagers (which is the issue currently before this Court); 2) the inclusion of expenses from wide area progressive slot machines in the net win calculation; and 3) the process by which Plaintiff Hannahville distributes 2% of the net win to local units of state government." (J.A. at 78). The parties subsequently reached an agreement on the issue of the wide area progressive machines, and the district court dismissed the distribution issue without prejudice because Plaintiff Hannahville did not contest it. Therefore, the first issue concerning calculation of net win was the only one before the district court, and accordingly, is the only issue before this Court.

Importantly, in the briefs submitted to this Court and to the district court, both Plaintiff Hannahville and Defendant attribute the alleged ambiguity to the entire phrase "total amount wagered." However, the arguments put forward in those briefs focus specifically on the ambiguity of the term "wager." Additionally, during oral argument, the question of ambiguity was discussed only with respect to the term "wager." We therefore conclude that the issue before this Court is whether the term "wager" is ambiguous.

The district court noted that it was undisputed that the QuickSilver tokens were considered wagers. Because a wager, definitionally, must incorporate some type of value, the court reasoned that the dispute was over what value to assign the tokens. Plaintiff Hannahville argued that the tokens need not correspond to a monetary amount to have value. According to Plaintiff Hannahville, the value of the QuickSilver tokens was that they were worth one chance to win a quarter. In support for its position, Plaintiff Hannahville attempted to introduce extrinsic evidence which showed that within the gaming industry, there is a way of understanding wagers which have no monetary value. Therefore, Plaintiff Hannahville argued, the concept of "wager" is latently ambiguous when applied within the context of this industry. Defendant countered that "wager" is unambiguous, and that the common sense definition of a wager contemplates a monetary value. Thus, Defendant urged the court to assign a monetary value of twenty-five cents to the tokens.

Defendant based this figure on evidence it submitted that Plaintiff Hannahville assigned a twenty-five cent value to the tokens in advertisements and internal records.

The district court held that the term wager was unambiguous and refused to consider Plaintiff Hannahville's extrinsic evidence. Instead, the court concluded that the tokens must be assigned a monetary value. The district court determined that, based on the advertisements and internal records introduced by Defendant, it was clear that Plaintiff Hannahville valued the tokens at twenty-five cents each. Accordingly, the court granted Defendant's motion and ordered Plaintiff Hannahville to pay Defendant $1,027,378.00 (plus interest), which is what Defendant would have received if Plaintiff Hannahville had valued the tokens at twenty-five cents each. The future value of the QuickSilver tokens was not in dispute, as Plaintiff Hannahville no longer uses Quicksilver tokens, but now gives away promotional free games on the regular slot machines using a card system. Plaintiff Hannahville calculates net win with respect to the promotional cards with the new system the same way it did with the QuickSilver tokens.

The district court issued an order on July 14, 2005 granting the motion. On July 26, 2005, Plaintiff Hannahville timely filed a Notice of Appeal of the order because it had the effect of an injunction and was therefore appealable. 28 U.S.C. § 1292(a)(1). The district court then entered a final judgment on November 9, 2005. Plaintiff Hannahville timely filed a second Notice of Appeal on November 18, 2005, as required by Fed. R. App. P. 4(a)(1). Plaintiff Hannahville filed a Motion to Hold Briefing Schedule in Abeyance so that the district court had time to consolidate the appeal from July 26, 2005 and the appeal from November 18, 2005. The district court granted that motion, so the two appeals have now been consolidated and are before this Court as a single appeal.

## DISCUSSION

### I.   Standard of Review

"A district court's interpretation of a consent decree or judgment is a matter of law subject to de novo review, and the underlying findings of fact are reviewed for clear error." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 371 (6th Cir. 1998). *See also City of Covington v. Covington Landing Ltd. Partnership*, 71 F.3d 1221, 1227 (6th Cir. 1995). Consent Judgments are analyzed as contracts. *Engler*, 146 F.3d at 372. We have held that "[t]he determination of whether a contract is ambiguous, thereby making extrinsic evidence admissible for interpretive purposes, is a question of law and therefore subject to de novo review." *Id*. at 373. Further, because the district court that interpreted this Consent Judgment is not the same one that wrote it, there is no need to apply the heightened "deferential *de novo* review" contemplated by this Court in *Engler*. *Id*. at 372. Finally, in deciding the questions of law presented, Michigan law properly guided the district court and will guide this Court as well. *Sawyer v. Arum*, 690 F.2d 590, 593 (6th Cir. 1982).[1]

### II.   Jurisdiction

The United States Constitution limits this Court's jurisdiction to actual, ongoing cases and controversies. U.S. Const. art. III. When the parties no longer have a "presently existing legally cognizable interest in the outcome of the litigation," a case is moot. *Murphy v. Hunt*, 455 U.S. 478, 481 (1982). While neither party raises mootness, this Court has an obligation to address jurisdiction

---

[1]There was some confusion as to the nature of the case before us and accordingly as to the appropriate standard of review. In the brief it submitted to this Court, Defendant characterized the district court's order as a grant of summary judgment. In response, Plaintiff Hannahville's reply brief likewise focused on the standard of review for a motion of summary judgment. In fact, there was no motion for summary judgment before the district court, only a Motion to Enforce the Stipulation and Consent Judgment. At oral argument, Defendant conceded that due to an oversight, it mischaracterized the motion in its brief and admitted that there was no motion for summary judgment. Thus, we properly review the district court's order as a grant of Defendant's Motion to Enforce the Stipulation and Consent Judgment.

in every case. *See Steel Co. v. Citizens For a Better Env't*, 523 U.S. 83, 94 (2001) ("On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it.") (internal citation and quotations marks omitted).

Plaintiff Hannahville admits that it no longer uses QuickSilver tokens. That fact alone does not render this case moot. Generally, a party lacks a sufficient present interest in the outcome of a case when a court is unable to effectuate any relief in the event of a favorable decision. *Murphy*, 455 U.S. at 481-82. In the instant case, though Plaintiff Hannahville is not presently using the QuickSilver tokens, the dispute centers around back pay that Defendant argues it is owed from Plaintiff Hannahville's past accounting practices. Furthermore, "[a]n exception to the mootness doctrine exists for wrongs that are 'capable of repetition, yet evading review.'" *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 584 (6th Cir. 2006). This exception applies when the challenged action ceases before it is able to be fully litigated, but "there is a reasonable expectation or a demonstrated probability that the controversy will recur." *Id.* Because Plaintiff Hannahville still offers promotional wagers to patrons, which work the same way as the QuickSilver tokens used to work, the controversy at issue here satisfies the *Libertarian Party* criteria of being "capable of repetition, yet evading review." *Id.* Thus, although the tokens are not currently in use, this case is properly before us.

## III.   Analysis

### A.      The district court committed reversible error by concluding that no latent ambiguity existed without first considering extrinsic evidence

"Consent decrees and judgments are binding contracts." *Engler*, 146 F.3d at 372. According to Michigan law, "[t]he cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate." *McIntosh v. Groomes*, 198 N.W.2d 954, 955 (1924). Our obligation in construing this Consent Judgment is to effectuate the intent of the parties, and extrinsic evidence is admissible only to the extent that it is necessary in order for us to do so. Where a contract is unambiguous on its face, extrinsic evidence is inadmissible because no outside evidence can better evince the intent of the parties than the writing itself. *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool,* 702 N.W.2d 106, 113 (Mich. 2005). Only where a contract contains ambiguous terms will consideration of outside evidence be necessary. Thus, the admissibility of extrinsic evidence is contingent upon "some finding of contractual ambiguity." *Id.*

Ambiguity can come in two forms: Patent ambiguities and latent ambiguities. "Patent ambiguities are those that clearly appear[] on the face of a document, arising from the language itself." *Black's Law Dictionary* 80 (7th ed. 1999). Therefore, a patent ambiguity will be readily apparent without the aid of extrinsic evidence to detect it. *City of Grosse Pointe Park*, 702 N.W.2d at 113. A latent ambiguity, on the other hand, is one that "does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." *Black's Law Dictionary* 80 (7th ed. 1999). A latent ambiguity will often arise when a term is being used within a technical or specialized field. In *J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.*, we noted that "technical terms and words of art are given their technical meaning when used in transaction within their technical field." 936 F.2d 1474, 1495 (6th Cir. 1991) (quoting Restatement (Second) of Contracts § 202(3)(b) (1981). Thus, a word may have a meaning that is different from its ordinary meaning within a particular field and the ambiguity will only be revealed when that word is applied in context. *Id.* Where both parties define a term according to its technical definition, extrinsic evidence is necessary to ascertain the actual intent of the parties. *See id.*

According to Michigan law, the burden is on the party alleging the ambiguity to present an interpretation of the contract that is equally as plausible as the common sense interpretation. *Smith v. ABS Indus., Inc*., 890 F.2d 841, 846 (6th Cir. 1989). The party alleging the ambiguity must carry this burden because a court "cannot create an ambiguity where none exists." *Upjohn Co. v. New Hampshire Ins. Co.*, 476 N.W.2d 392, 397 (Mich. 1991). If the alleging party presents evidence to prove a latent ambiguity it must be considered by the court. "[T]he detection of a latent ambiguity requires a consideration of factors outside the instrument itself" and therefore "extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist." *McCarty v. Mercury Metalcraft Co.*,127 N.W.2d 340, 343 (1964). In other words, the allegation of a latent ambiguity gives a court cause to consider extrinsic evidence at least once: The court must consider the extrinsic evidence to determine if there exists an ambiguity and then, if an ambiguity does exist, the court must consider extrinsic evidence to resolve that ambiguity.

Despite this well-settled tenet of Michigan contract law, this Court has had occasion to hold that no error occurred even though a district court failed to consider extrinsic evidence to determine whether a latent ambiguity existed. *R.E. Dailey & Co. v. John Madden Co.*, 1993 U.S. App. LEXIS 20289, *13, n.2 (6th Cir. 1993) (unpublished). In *R.E. Dailey*, this Court concluded that while the district court should have considered extrinsic evidence before concluding that no latent ambiguity existed, upon *de novo* review, it was clear that consideration of such evidence would have shown that no ambiguity existed. *Id*. Because we were convinced that "the only reasonable conclusion" after a review of the record was that no ambiguity existed, we held that there was no reversible error. *Id*. Thus, in spite of the failure to properly consider extrinsic evidence, we declined to reverse the district court decision. Therefore, the mere fact that a district court improperly refuses to consider extrinsic evidence in its determination that there is no ambiguity does not *ipso facto* result in a reversible error. In our *de novo* review, we must determine whether consideration of extrinsic evidence would have revealed a latent ambiguity. *See id*.

In the present case, we conclude that a latent ambiguity did exist with respect to the meaning of "wager" as the term is used in the gaming industry and that extrinsic evidence is necessary to resolve it. It is beyond dispute that the district court did not consider extrinsic evidence to determine whether a latent ambiguity existed. However, this does not end our inquiry. We must determine whether a review of the extrinsic evidence would have revealed an ambiguity in order to decide whether the district court committed reversible error. *Id*.

Plaintiff Hannahville attempted to introduce several pieces of extrinsic evidence: 1) the Gaming Compact between Plaintiff Hannahville and Defendant; 2) information on Plaintiff Hannahville's Nevada-approved online accounting slot information system (known as "OASIS"); 3) information on the standards for Plaintiff Hannahville's financial statements completed in compliance with Generally Accepted Accounting Principles ("GAAP"); 4) information on the standards of Plaintiff Hannahville's annual audit completed in compliance with the American Institute of Certified Public Accountants ("AICPA") Audit and Accounting Guide for Casinos ("the AICPA Guide"); 5) standards of the Nevada Gaming Commission with respect to wagering, promotional play, and reporting profits; and 6) standards of the National Indian Gaming Commission with respect to wagering, promotional play, and reporting profits. Plaintiff Hannahville alleges that these materials are relevant to illustrate that within the gaming industry it is possible, and indeed common, to contemplate a "wager" that has no monetary value.

A review of this evidence reveals a latent ambiguity with respect to the meaning of the term "wager" and whether the Consent Judgment permitted Plaintiff to use a zero cent wager. Specifically, we base our conclusion on two pieces of evidence: the AICPA Guide, with which Plaintiff Hannahville is federally required to comply, 25 C.F.R. § 571.12, and the standards of the Nevada Gaming Commission, which provides the basis for Plaintiff Hannahville's accounting practices. The AICPA Guide explicitly states in relevant part:

> 2.03    Promotional allowances (complementaries, or comps) represent goods and services, which would be accounted for as revenue *if sold*, that a casino gives to customers as an inducement to gamble at that establishment.

And:

> 2.04    . . . .The retail amount of promotional allowances should not be included in gross revenues and charged to operating expenses because that would overstate both revenues and expenses.

(J.A. at 191) (emphasis added).  While these passages do not explicitly refer to "wagers," the term "promotional allowances" refers to "comps," which is undisputedly what QuickSilver tokens are considered.  According to this language, casinos are advised not to include the value of comps in their overall revenue computations unless the comps are sold.  Further, a document from the Nevada Gaming Commission states:

> 463.0161      1. "Gross revenue" means the total of all: . . .
>
> 2. The term does not include: . . .
>
> g) Cash provided by the licensee to a patron and subsequently won by the licensee for which the licensee can demonstrate that it or its affiliate has not been reimbursed.

(J.A. at 252).  Again, while the term "wager" is not found in this language, the passage excludes from the definition of "gross revenue" all cash given free of charge to a patron by the casino that is then used by the patron for gambling in the casino.  This passage is describing comps.  In other words, the Nevada Gaming Commission, like the AICPA Guide, urges casinos to exclude comps from the computation of gross revenue.  We are persuaded that Plaintiff Hannahville's extrinsic evidence indicates that within the gaming industry the term "wager" has a technical meaning that may be able to contemplate a zero cent promotional wager.  This industry specific definition creates a latent ambiguity that may only be resolved with the aid of extrinsic evidence.  Thus, the district court erred in refusing to consider such evidence.

We are further convinced that a reversible error has occurred by the fact that the district court used extrinsic evidence to determine what the value of the tokens should be.  The district court was persuaded that the tokens should be valued at twenty-five cents each by reviewing extrinsic evidence offered by Defendant, specifically Plaintiff Hannahville's Daily Revenue Report and advertisements that Plaintiff Hannahville circulated.  However, the district court considered this evidence while simultaneously refusing to consider the extrinsic evidence being offered by Plaintiff Hannahville.  Defendant attempts to draw a distinction between the district court's use of extrinsic evidence in determining the value of the tokens versus determining the existence of an ambiguity.  Defendant observes that Plaintiff Hannahville's evidence was offered to show that there existed an ambiguity while Defendant's extrinsic evidence was offered to prove the value of the tokens.  However, these two questions cannot be so easily separated.  Plaintiff Hannahville argues that the value of the tokens was zero cents.  Defendant's argument is that the concept of a wager that has no corresponding cash value is at odds with the common sense definition of "wager."  Plaintiff Hannahville argues that the gaming industry has a way of contemplating a wager that has no cash value.  Thus, Plaintiff Hannahville argues, the only way to understand the meaning of "wager" in the Consent Judgment is to place it in the context of the technical and specialized gaming industry.  We can draw a straight line, then, from the question of what value to give the tokens to the question of whether there exists a latent ambiguity with respect to the meaning of the word "wager."  Because these two questions are inextricably intertwined, the inability to resolve the former question without the aid of extrinsic evidence indicates to us that a latent ambiguity existed with respect to the latter

question. Thus, the district court committed reversible error by refusing to consider extrinsic evidence to determine whether there was an ambiguity. We conclude that an ambiguity does exist, and therefore, that extrinsic evidence is admissible.

**B.      The district court committed reversible error by concluding that QuickSilver tokens had a cash value of twenty-five cents without first considering extrinsic evidence offered by Plaintiff Hannahville**

Now that we have established that a latent ambiguity existed, we now must consider the admissibility of Plaintiff Hannahville's proffered extrinsic evidence. Put another way, the first question we considered dealt with the admissibility of *any* extrinsic evidence. The next question deals with the admissibility of the specific extrinsic evidence offered by Plaintiff Hannahville.

The existence of a latent ambiguity does not grant carte blanche to parties to admit any and all extrinsic evidence imaginable. Extrinsic evidence must be relevant in order to be admitted to resolve an ambiguity. *Engler*, 146 F.3d at 373. We have held that in order "[f]or extrinsic evidence to be relevant, it must relate to the formation of the contract." *Id. See also*, *Sawyer*, 690 F.2d at 593. Thus, even where an ambiguity exists, extrinsic evidence must shed some light on the circumstances surrounding the contract formation in order to be admissible.

There are several categories of extrinsic evidence that this Court has determined is relevant to resolve contractual ambiguities. We have consistently held that where an industry is specialized, extrinsic evidence that helps define words within their specialized context is admissible. "Where a contract provides little guidance in interpreting a disputed term, we may properly look to . . . the standards and practices within the relevant industry." *City of Wyandotte v. CONRAIL*, 262 F.3d 581, 586 (6th Cir. 2001). We further explained in *Booth v. North Am. Aluminum Corp*. that "[n]o contract language can be interpreted only in the abstract. If trade practice, custom or usage has infused special meaning into these words, which both parties bargained with reference to, then it should be proved affirmatively, and findings should be made with regard to it." 423 F.2d 545, 547 (6th Cir. 1970). Thus, where an allegation is made that industry standards have given rise to the ambiguity, evidence elucidating those industry standards is relevant and should be admitted.

In the present case, Plaintiff Hannahville attempts to introduce several pieces of extrinsic evidence which can be understood to fall under the broad category of evidence that presents the industry standards for understanding promotional play and industry accounting practices. We are persuaded that this information is relevant as to the question of the appropriate value to assign the tokens. As we held in *Booth*, because if "trade practice, custom or usage has infused special meaning into these words, which both parties bargained with reference to," then that special meaning must be understood in order to determine the meaning of the term. 423 F.2d at 547. The evidence Plaintiff Hannahville proffers sheds light on the industry's treatment of promotional play and the valuation of promotional tokens. This goes to the very heart of the dispute in this case. If, as Plaintiff Hannahville contends, the gaming industry has a method of understanding promotional play tokens as having no monetary value, then this method may well have been part of the surrounding circumstances considered by Plaintiff Hannahville and Defendant when they entered into the Stipulation and Consent Judgment.

Once again, the fact that the district court considered extrinsic evidence offered by Defendant in granting Defendant's motion is significant. As we have previously held, where a court considers extrinsic evidence offered by one party on a particular issue, it should likewise consider extrinsic evidence offered by the other party. *See B.F. Goodrich Co. v. United States Filter Corp*., 245 F.3d 587, 591 (6th Cir. 2001). Thus, because both parties offered extrinsic evidence on the question of the value of the QuickSilver tokens, the district court should have considered each party's evidence in making its determination.

While we hold that Plaintiff Hannahville's extrinsic evidence is relevant and therefore admissible, we decline to make a determination with respect to the question of what value to assign the tokens. The admissibility of extrinsic evidence is a question of law and is properly within our province to determine. *Engler*, 146 F.3d at 373. However, the amount of weight to accord extrinsic evidence is a question of fact and must be determined by a trier of fact. *See id*. We therefore remand this case to the district court and instruct that extrinsic evidence shall be considered to determine whether QuickSilver tokens should be assigned any value, and if so, what the appropriate value is.

## CONCLUSION

For the foregoing reasons, we **REVERSE** and **REMAND** to the district court for further proceedings consistent with this opinion.

---

## CONCURRENCE

---

KATZ, District Judge, concurring. I write separately to explain my limited concurrence and express my view of the district court's opinion. My concurrence is limited to agreement with my colleagues that the failure to admit and then consider extrinsic evidence offered by the Plaintiffs, after having accepted and relied upon extrinsic evidence offered by Defendant, was erroneous and justifies reversal and remand. Extrinsic evidence could have impact upon both the determination of the ambiguity of contract language as well as the monetary value to be assigned to the Quicksilver tokens.

That being said, I believe that the conclusion reached in the district court's well-reasoned opinion concerning the method of calculating "net win" was supported by the evidence and facts that were before the court. On remand, I presume those determinations may well prove to be justified and the district court's basic opinion to be restated unless some newly admitted and considered extrinsic evidence compels a different result.