**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File No: 18a0334n.06

**Case Nos. 17-5767/5844**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| **FIRST HORIZON NATIONAL CORPORATION**, *et al.*, | ) ) ) ) | **FILED** Jul 10, 2018 DEBORAH S. HUNT, Clerk |
| *Plaintiffs-Appellants/Cross-Appellees*, | ) ) | |
| v. | ) ) ) | **ON APPEAL FROM THE UNITED STATES DISTRICT** |
| **HOUSTON CASUALTY CO.**, *et al.*, | ) ) ) | **COURT FOR THE WESTERN DISTRICT OF TENNESSEE** |
| *Defendants-Appellees/Cross-Appellants*. | ) ) ) | |

**Before: BATCHELDER, McKEAGUE, and GRIFFIN, Circuit Judges.**

**ALICE M. BATCHELDER, Circuit Judge.** First Horizon National Corporation and its wholly-owned subsidiary First Tennessee Bank N.A. (hereinafter collectively "First Horizon") are mortgage lenders that purchased $75 million in "wrongful acts" insurance from the defendant insurers ("Insurers") to cover "claims made" during the one-year policy period from August 1, 2013 to 2014. When First Horizon filed a claim arising from wrongful acts that had led to a Department of Justice (DOJ) investigation and settlement under the False Claims Act, the Insurers denied coverage. First Horizon sued seeking a declaratory judgment on the issue of coverage and raising claims of breach of contract and bad-faith denial of coverage. Certain defendant Insurers countersued claiming breach of a settlement agreement and bad faith. The district court granted partial summary judgments to both, denying all claims and counterclaims, and ending the action. First Horizon appeals and the Insurers cross-appeal. We AFFIRM.

**I.**

Back in 2011, the Federal Housing Finance Agency (FHFA) had sued First Horizon, claiming that it had made materially false or misleading statements and omissions in its prospectuses about its mortgage-backed securities. After First Horizon settled with the FHFA, it filed an insurance claim under its 2009-2010 Policy. That led to a Settlement Agreement in which First Horizon released the Insurers from further claims "arising out of, based upon[,] or attributable to the same facts, circumstances, situations, transactions[,] or events . . . as the FHFA Action." This first action is referred to as the "FHFA suit" and the Insurers contend that the current suit (referred to, perhaps confusingly, as the "FHA suit") is just a continuation of that FHFA suit and therefore subject to the Settlement Agreement's release provision.

This FHA suit began in 2012, when the Office of Inspector General (OIG) for the Department of Housing and Urban Development (HUD) began an investigation into whether First Horizon had violated the False Claims Act in its certifications to HUD about its compliance with the underwriting and quality-control requirements of its Fair Housing Act (FHA) mortgages. This investigation included subpoenas and Civil Investigative Demands (CIDs) for interrogatory responses, depositions, and document production, over the course of a year.

On May 16, 2013, representatives from the DOJ, OIG, HUD, and the U.S. Attorney's Office (USAO) (collectively the "Government") met with First Horizon and its counsel regarding this FHA suit. The Government marked each page of its presentation handout "Subject to Federal Rule of Evidence 408," designating it for settlement negotiations and therefore inadmissible in court. In substance, the presentation set out the elements of a False Claims Act violation, summarized its findings that First Horizon was in violation (including a finding that "67.1 percent of the loan files (102 of 152) contained serious deficiencies and demonstrated that First [Horizon] failed to exercise due diligence in originating and underwriting its FHA loans"), projected

2

"theoretical damages and penalties" upward of $1.19 billion, and concluded that the investigation and settlement discussions would continue. The Government continued the investigation and the parties continued communications.

On August 1, 2013, the one-year policy period began for the Policy at issue in this case.

In February 2014, the DOJ and First Horizon executed a "tolling agreement," in which the DOJ agreed not to file "a civil action against First [Horizon] under the False Claims Act . . . on or before March 3, 2014," so as to allow for ongoing "discussions relating to the possible settlement of the [c]ivil [c]laims prior to suit[.]" While admitting the authenticity of this tolling agreement, First Horizon denies that it was actually engaged in formal settlement discussions with the Government during or prior to February 2014, or that there were any impending civil claims.

On April 29, 2014, a DOJ lawyer made an oral *settlement offer* by phone to First Horizon in the amount of $610 million, which he then confirmed in writing via email. The email expressly referred to the $610 million as a "settlement offer" and explained that the DOJ "would welcome further discussion and information sharing but believe[d] that for it to be productive, First [Horizon] should provide a counterproposal." The email contained a list of the First Horizon mortgages that the DOJ said were materially deficient. A follow-up email from the DOJ agreed to extend the tolling date until October 31, 2014, but warned: "I don't think we can push back the date by which we agree to file suit beyond June."

First Horizon says this $610 million figure was not actually a settlement offer, but part of a preliminary discussion about their relative litigation positions. The DOJ sent additional requests for a settlement proposal from First Horizon without success. In June 2014, First Horizon's counsel replied: "My client fully intends to make a comprehensive presentation that will address many aspects of the government's claims; we are not looking to simply propose a number[.]"

3

On May 27, 2014, First Horizon sent the Insurers an email with attachments, as a Notice of Circumstances (NOC) that may give rise to a claim under the Policy. It said:

> Since [the] second quarter 2012[,] [First Horizon] has been cooperating with the U.S. Department of Justice ('DOJ') and the Office of the Inspector General for the Department of Housing and Urban Development ('HUD') in a civil investigation regarding compliance with requirements relating to certain Federal Housing Administration ('FHA')-insured loans.
>
> During [the] second quarter 2013[,] DOJ and HUD provided [First Horizon] with preliminary findings of the investigation, which focused on a small sample of loans and remained incomplete. [First Horizon] prepared its own analysis of the sample and has provided certain information to DOJ and HUD.
>
> Discussions between the parties are continuing as to various matters, including certain factual information. The investigation could lead to a demand or claim under the federal False Claims Act and the federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989, which allow treble and other special damages substantially in excess of actual losses.
>
> Currently [First Horizon] is not able to predict the eventual outcome of this matter. [First Horizon] has established no liability for this matter and is not able to estimate a range of reasonably possible loss due to significant uncertainties regarding: the potential remedies, including any amount of enhanced damages, that might be available or awarded; the availability of significantly dispositive defenses; [First Horizon]'s lack of information that would enable [it] to assess performance concerning its FHA-insured originations, nearly all of which [First Horizon] does not service; and the small number of reported precedent claims and resolutions (involving other banking organizations) combined with a lack of underlying data connected with those resolutions. The investigation has focused on loans originated by [First Horizon] on or after January 1, 2006.
>
> FHA-insured originations from January 1, 2006[,] through the August 31, 2008 divestiture of [First Horizon]'s national mortgage platform[,] totaled 47,817 loans with an aggregate original principal balance of $8.2 billion.

This NOC did not disclose the Government's $610 million "settlement offer" from April 2014 or attach that email. Nor did it reveal that First Horizon and the DOJ had engaged in a series of tolling agreements in which the DOJ agreed to push back the date by which it would file a civil suit as they pursued a settlement.

On August 1, 2014, the policy period ended for the Policy at issue here. Consequently, the 90-day deadline for filing a Claim under that Policy would have ended on October 30, 2014.

4

As a matter of routine, First Horizon holds "Quarterly Claim Conference Calls" with each of its insurers to provide updates on all of its outstanding Claims and NOCs. First Horizon discussed the FHA suit's NOC in calls on July 23, 2014, October 23, 2014, and January 22, 2015, but in none of those calls did it ever mention the April 2014 $610 million settlement offer. In September 2014, First Horizon set aside a $50 million litigation reserve for this FHA suit, but did not tell the Insurers about it during the October 23, 2014 call or at any other relevant time.

On December 17, 2014, the Government gave First Horizon a renewed oral presentation of its litigation position, which it also provided in writing. The DOJ relied on its findings from the May 2013 Presentation and the settlement offer from the April 2014 email. The DOJ said that the investigation was substantially complete and, having received no response to its April 2014 settlement offer, it would proceed with the suit unless First Horizon sent a settlement offer counterproposal that was sufficient to convince it that further settlement discussions were likely to be productive. First Horizon currently contends that this was when the Government first made a "claim" as defined by the Policy. But First Horizon did not immediately contact the Insurers to file a claim and, oddly, during the Quarterly Claim Conference Call on January 22, 2015, counsel for First Horizon stated that DOJ had still made no claim or demand. Nor, in light of this contention, does First Horizon explain why it had set aside the $50 million litigation reserve back in September.

On February 25, 2015, First Horizon alerted the Insurers that it had a meeting scheduled with the Government two days hence (on February 27), at which it would make a $50 million settlement offer, and requested that the Insurers provide the $50 million. The next day, February 26, 2015, the Insurers sent First Horizon written requests for material information and reserved their rights to deny coverage based on their position that the Government had actually made the "Claim" prior to the inception of the Policy period and they had not received proper notice.

5

On February 27, 2015, First Horizon made the $50 million settlement offer to the Government. The Government declined the offer but negotiations continued.

In March 2015, First Horizon asked the Insurers to fund a settlement in the amount of $65 million, and then $85 million, and then sought "an agreement from the insurers not to raise lack of consent to such a settlement amount as a coverage defense." Although no Insurer had actually denied coverage, all had reserved their right to do so, and on April 9, 2015, First Horizon filed this lawsuit seeking a declaratory judgment that it was entitled to coverage.

On June 1, 2015, First Horizon settled with the Government for $212.5 million, which First Horizon paid in full. On August 5, 2015, First Horizon sent a demand letter to each Insurer, demanding coverage and asserting that the Insurers had no basis to deny it. The lawsuit continued and both sides eventually moved for summary judgment. On May 28, 2017, the district court heard argument on the competing motions. At that hearing, both parties agreed as to every issue that summary judgment would be appropriate.

## II.

The district court resolved all claims on summary judgment—some for First Horizon and some for the Insurers—ending the action. *First Horizon Nat'l Corp. v. Houston Cas. Co.*, No. 15-cv-2235, 2017 WL 2954716, at *18 (W.D. Tenn. June 23, 2017). The court set out four issues for resolution (the same four issues here on appeal): (1) when did the FHA suit first constitute a "Claim" under the Policy; (2) whether First Horizon gave the Insurers proper notice of the Claim; (3) whether the FHFA suit's Settlement Agreement released the Insurers from coverage of the FHA suit; and (4) the bad faith claims. *Id.* at *8. The court summarized:

> Ultimately, th[is] [c]ourt concludes that the April 2014 settlement offer was a Claim that [First Horizon] failed to give appropriate notice of under the Policy. Therefore, [the Insurers] properly denied coverage. Further, the [c]ourt finds that the FHFA Action and the FHA action are not interrelated under the terms of the Settling

6

> Insurers' prior release. Given the reasonable dispute between the Parties as to the timing of the Claim, the [c]ourt also dismisses all bad faith claims.

*Id.* at \*9.  In beginning its analysis, the court established that Tennessee law governed, quoted the pertinent Policy provisions, and addressed the ordinary meaning of "demand" (which was not defined in the Policy) before rejecting the Insurers' arguments that anything before the April 2014 email—such as the investigatory CIDs, the tolling agreements, or the March 2013 Presentation— would qualify as a demand (and hence a claim).  *Id.* at \*9-12.  The court did find that the May 2013 Presentation was sufficiently threatening to alert First Horizon that the FHA suit would "reasonably be expected to give rise to a Claim," so as to trigger an NOC for that policy period, but emphasized that an NOC is optional and not required under the Policy.  *Id.* at \*12.

Turning to the April 2014 email, the court rejected First Horizon's argument that the settlement offer was not sufficiently threatening or formal to constitute a demand, and explained:

> In the April 2014 email, the DOJ stated its settlement offer of $610 million and requested a counterproposal from [First Horizon].  First, this communication must be viewed in light of all that came before it, including the May 2013 Presentation which nudged so close to the line of being a demand.
>
> In the April 2014 email, the DOJ included even more information as it explained its calculation of damages, its process for evaluating deficient loans[,] and noted that it had conducted significant investigative work into [First Horizon's] underwriting.  Furthermore, in follow-up written communications, counsel for the DOJ specifically stated that it sought to file suit by June 2014, absent a 'meaningful response' from [First Horizon] as to its settlement offer.
>
> Even under [First Horizon's] more narrow definition of 'demand,' the written DOJ communications in April 2014—wherein the DOJ told [First Horizon] to submit a counter-offer or they would sue—meets [First Horizon's] 'put up or shut up' standard.
>
> Th[is] [c]ourt finds that the only reasonable interpretation of the April 2014 email and settlement offer is that it was 'demand for monetary . . . relief' under the Policy, and, thus, it is a Claim.

*Id.* at \*13 (record citations omitted; paragraph breaks added).  Because the April 2014 email was a "demand" that would have prompted a reasonable person to file an insurance claim on the Policy,

First Horizon had 90 days from the end of the policy period (i.e., by October 30, 2014) to file its claim. First Horizon did not file its claim with the Insurers until February 2015.

On the second issue, the notice issue, the court explained that the Policy provided First Horizon with a means of preserving its right to file a claim by submitting an NOC "to tie a future claim to the current policy period." *Id.* That is, an NOC properly filed during the Policy period would, by giving the Insurers notice of the forthcoming Claim, allow First Horizon to file that Claim even if it matured after the October 30 deadline. The court explained:

> An effective Notice of Circumstance must be filed when the insured 'first become[s] aware of any circumstance which may reasonably be expected to give rise to a Claim.' To rely on an NOC, 'the Insureds give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, potential claimants[,] and the consequences which have resulted or may result therefrom.'

*Id.* (quoting the Policy's General Conditions provision (E)(2), p. 6 of 60).

The court returned to its earlier finding that it was during the Government's Presentation in May 2013 that First Horizon had (quoting the language of the Policy) "first become aware of any circumstance which may reasonably be expected to give rise to a Claim," so the NOC filed in May 2014 was untimely. *Id.* at *14. But, given the court's principal holding that the April 2014 email triggered an actual Claim, and because the May 2014 notice would certainly be timely as to that Claim, the question was whether that notice was *sufficient*. *Id.* The court said:

> [In] the NOC, [First Horizon] stated that [it] w[as] cooperating in a civil investigation with the DOJ regarding compliance with requirements of FHA loans, that the DOJ presented preliminary findings to First [Horizon] on a small sample of loans, that 'the investigation could lead to a demand or claim under the federal False Claims Act,' and that the loans being investigated totaled 47,817 loans with an aggregate original principal balance of $8.2 billion. However, [First Horizon] did not provide information about the $610 million settlement offer submitted by the DOJ just one month earlier in April. . . .
>
> The general, boiler-plate type language contained in the NOC was not sufficient notice of this Claim. . . . [T]here was very little information in the May 2014 NOC that was not available to [First Horizon] prior to the relevant policy period. . . . [I]n the NOC, [First Horizon] stated that the DOJ investigation 'could lead to a demand,' that 'discussions between the parties are continuing,' and that '[First

8

Horizon] has established no liability for this matter and is not able to estimate a range of reasonably possible loss.' These statements are not reflective of the state of affairs at the time, and do not give notice of a Claim under the Policy.

*Id*. at \*14-15 (citations and footnote omitted). The court also rejected First Horizon's argument that the Insurers had waived any objection to that NOC by failing to timely challenge it:

In Tennessee, waiver is a voluntary relinquishment by a party of a known right. Here, [the Insurers] had no known right [to waive], as there was no indication of impending litigation in [First Horizon's] NOC. . . . The NOC was deficient not only because of its broad language, but because the Insurers should have received notice of *a Claim*, not a notice of circumstances. Having no knowledge that a Claim had occurred here, specifically the $610 million settlement offer by the DOJ, [the Insurers] could not have waived their right to object. As soon as [the Insurers] became aware of the Claim in February 2015, [when First Horizon filed its claim formally,] they each reserved their rights. The [c]ourt finds that the Insurers did not waive their right to object to the NOC as notice of the Claim.

*Id.* at \*15 (quotation marks and citation omitted; emphasis in original).

The district court also denied the Insurers' counter-claims. It rejected the argument that the FHA suit fell within the FHFA suit's Settlement Agreement release, explaining:

While there are underlying allegations in the FHFA Action and the FHA Claim that overlap—specifically underwriting deficiencies—there are not sufficient common factual allegations to warrant a conclusion that they are interrelated for purposes of [the Insurers'] Counterclaims. The FHFA Action was a securities action brought in connection with deficient underwriting of mortgage-backed securities, whereas the FHA Claim alleges that [First Horizon] failed to do [its] due diligence in compliance with the underwriting guidelines of [HUD].

*Id*. at \*16. And the court rejected the Insurers' state-law statutory bad-faith claim:

At this stage, there is not sufficient evidence that this action was not filed in good faith under Tenn. Code Ann. § 56-7-106. There is nothing in the record to dispute that [First Horizon's] position that its optional NOC properly notified [the Insurers] of the Claim under the relevant Policy Period was brought in good faith.

*Id*. at \*17 (footnote omitted).

First Horizon appeals the first two issues and the Insurers cross-appeal the second two.

### III.

We review the grant of summary judgment de novo, construing facts and inferences in the light most favorable to the non-moving party. *Brown v. Battle Creek Police Dep't*, 844 F.3d 556,

9

565 (6th Cir. 2016). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Stryker Corp. v. Nat'l Union Fire Ins.*, 842 F.3d 422, 426 (6th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

## A.

First Horizon argues several reasons why the district court was wrong in holding that the April 2014 settlement offer was a "claim" as defined in the Policy. The Policy defines a "claim" as "any written demand for monetary, non-monetary[,] or injunctive relief." But the Policy does not define "demand" and the parties disagreed on the appropriate definition. The district court defined it thus:

> The gravamen of a legal demand is its notice-providing function. Even a writing phrased as a 'request' can constitute a 'demand where it is a request to do a particular thing specified under a claim of right. While a demand may be couched in the customarily-used polite language of the day, a mere request for an explanation, expression of dissatisfaction, or lodging of a grievance that falls short of an insistence on a course of action is not a demand. A demand need not expressly demand payment if by implication its meaning is clear.

*First Horizon*, 2017 WL 2954716 at *11 (citations, quotation marks, and editorial marks omitted). First Horizon says the Government's first demand was not made until December 2014, but related back to the Policy period via the May 2014 NOC. The district court held that the demand was actually made in April 2014, making the insurance claim due no later than October 2014. Under Tennessee law, failure to provide timely notice forfeits coverage. *Union Planters Bank v. Cont'l Cas. Co.*, 478 F.3d 759, 766 (6th Cir. 2007) (citing *Pope v. Leuty & Heath*, 87 S.W.3d 89 (Tenn. Ct. App. 2002), and *Blackman v. U.S. Cas. Co.*, 103 S.W. 784 (Tenn. 1907)).

First Horizon contends that the April 2014 email was not a "demand," which would trigger a "claim," because "[a] 'demand' is a forceful statement coupled with a threat of consequences," and the April 2014 email "contains no forceful statement seeking money accompanied by any threat of consequences," or "anything 'under claim of right.'" Accepting this definition would

require us to reject the district court's thoughtful, and eminently reasonable, explanation that a communication can still be a demand even if "phrased as a 'request'. . . where it is a request to do a particular thing specified under a claim of right," that "may be couched in the customarily-used polite language of the day," and that it "need not expressly demand payment if by implication its meaning is clear." *First Horizon*, 2017 WL 2954716 at \*11. We agree with the district court's explanation.

First Horizon says that the April 2014 email was not a demand because First Horizon's counsel—who received the email—said it was not, based on the content of his telephone call with the Government that preceded the email. The district court excluded this proffered testimony as extrinsic evidence. Given that this partisan testimony, based on hearsay received from a telephone call, is offered to prove that a document (email) that looks like a settlement offer and even describes itself as a "settlement offer" is not actually a settlement offer, the district court did not abuse its discretion by excluding this testimony. Regardless, even if admissible and admitted, this testimony does not put the meaning of the email into *reasonable* dispute.

First Horizon says the April 2014 email was not a demand because—claiming that even the Insurers admitted it was not a binding offer—DOJ trial attorneys do not have the authority to enter into such settlement agreements. But First Horizon contradicts itself by arguing that the December 2014 Presentation *was* a demand, even though it was the same non-binding offer from the same DOJ trial attorneys. Regardless, we decline to hold that DOJ trial attorneys cannot make demands because they cannot unilaterally settle the matter in which such demands are made.

First Horizon says that the April 2014 email was not a demand because, after sending it, the Government continued to investigate for seven more months rather than start litigation right away and the email's "offer to engage in 'further discussion and information sharing' shows that the Government was still evaluating its rights and remedies at the time." The Government's offer

to settle was most likely, and most reasonably, intended to avoid continued investigation, and this begs the question of what it was that the Government was offering to settle if it were not making a demand. Also, as described in the email, the Government's willingness to engage in further discussion and information sharing was directed at First Horizon's desire to explore a lower settlement (lesser demand) based on its inability to pay. At no point does the record demonstrate that the Government was still unsure of its case or wavering in its intent to prosecute.

First Horizon says that the April 2014 email was not a demand because the Government's follow-up email, stating "I don't think we can push back the date by which we agree to file suit beyond June," was not actually a threat to sue by June 2014 but instead "was simply the Government's effort to extend the tolling agreement already in place." First Horizon says that the fact that no lawsuit had been filed by June 2014 supports this characterization. Again, the Government's willingness to continue settlement negotiations does not negate the existence of a demand; rather, the existence of settlement negotiations presupposed a demand.

Finding no merit to any of these arguments, we conclude that this challenge fails.

**B.**

First Horizon again argues many reasons the district court was wrong in holding that the May 2014 NOC did not give sufficient notice to preserve the claim, as was required by the Policy. First Horizon says the Government made its first demand in December 2014, which was beyond 90 days from the end of the Policy period (i.e., after October 30, 2014), but that the May 2014 NOC, which was within the August 2013 to 2014 Policy period, caused the claim to relate back. Alternatively, First Horizon says that even if the April 2014 email was the demand, then its May 2014 NOC was actually a timely filing of its insurance Claim rather than merely a notice.

First Horizon maintains that the May 2014 NOC was timely because First Horizon had the option of submitting it "whenever [First Horizon] reasonably expects any circumstance to give rise

12

to a Claim."  First Horizon elaborates: "All that matters is that there is a circumstance—not the *first*—which would reasonably be expected to give rise to a Claim and that the policyholder first bec[a]me aware of that circumstance in the policy period in which it gives notice."  But the Policy actually says that for an NOC to be effective it must be filed when the insured "first become[s] aware of any circumstance which may reasonably be expected to give rise to a Claim."  There is simply no way to read that provision as First Horizon urges.

First Horizon says the May 2013 Presentation did not warrant an NOC because, at that time, First Horizon "reasonably did not expect the Investigation to become a Claim," based on: the investigation's still being in its preliminary stages, before First Horizon had prepared any defense; the "contemporaneous notes taken [by First Horizon representatives] during the May 2013 Presentation reflecting the Government's statement that 'this is not a demand'"; and the purported, "repeated statements by the Government following the May 2013 Presentation that it was only conducting an investigation and not alleging any wrongdoing against the bank."  But First Horizon's subjective beliefs are irrelevant; the question is whether a reasonable person would objectively expect the information presented in the May 2013 Presentation to give rise to a claim at some point in the future. *See Tenn. Farmers Mut. Ins. Co. v. Crick,* 1994 WL 725201, at \*3 (Tenn. Ct. App. Dec. 30, 1994).  The district court was correct that a reasonable person would expect exactly that.  While the district court was also correct that First Horizon's "contemporaneous notes" were inadmissible and irrelevant, those notes are revealing in that First Horizon would find value in them only because the Presentation was a de facto demand or looked so much like a demand that First Horizon sought assurance that it was not.  Finally, we cannot agree that later occurring statements have any bearing on the objective assessment of the May 2013 Presentation itself.

First Horizon says that the May 2014 NOC contained sufficient detail because it "afforded the Insurers an opportunity to perform an investigation and set forth the essential facts of the Government's Investigation," even without mention of the $610 million settlement offer in the April 2014 email. Specifically, the Insurers were not "prejudiced" by that omission because the NOC "expressly disclosed that the Investigation targeted an $8.2 *billion* loan portfolio," and because it "clearly notified [the Insurers] in May 2014—*during* the 2013-14 Policy Period—that the Investigation could lead to a substantial exposure for actual and treble damages under the FCA." The Insurers point out that First Horizon did not raise this "notice-prejudice" argument in the district court and, therefore, failed to preserve it for appeal. True enough. Regardless, under Tennessee law, the Insurers do not need to demonstrate prejudice. *See Union Planters*, 478 F.3d at 766.

First Horizon says that the Insurers waived any right to challenge the May 2014 NOC because "they did not raise any defects" until after First Horizon made its formal Claim in February 2015, and "[i]f the Insurers thought the May 2014 [NOC] was deficient, they were obligated to let [First Horizon] know so it could cure any perceived defect before the Policy Period expired." But, as the district court explained, the Insurers had no cause to suspect that the May 2014 NOC was deficient or identify any defects until after they learned of the April 2014 settlement offer, which they learned only via a litigation discovery request in June 2015, well after First Horizon made an official claim (February 2015) and filed this lawsuit (April 2015). Until that time, and actually beyond, First Horizon had assured the Insurers that there had been no demand. The Insurers could not waive anything that First Horizon concealed from them.

First Horizon says that the May 2014 NOC was actually a notice of a claim (not merely a "notice of circumstance," despite being labeled as such), because it substantially complied with the Policy's notice-of-claim provision under General Condition (E)(3), which requires only that

14

the insured "must refer to the policy number set forth on the Declarations, must request coverage under this Policy[,] and must be given by certified mail or email." The Insurers rebut this, quite correctly and persuasively, because "[a] reference to a *potential* 'demand or claim' conveys to any reasonable reader that no actual 'demand' or 'claim' exists." Thus, the May 2014 NOC—far from being a notice of claim—emphasized the absence of any such claim, at least as of yet.

Finding no merit to any of these arguments, we conclude that this challenge fails.

## C.

On cross appeal, the Insurers argue that the broad language of the FHFA Settlement Agreement released them from coverage for claims raised in this FHA suit because the complaints filed for the two suits "reveal common fact allegations on their face[s]." Specifically, they contend that "the deficiently-underwritten FHA loans addressed in the [FHFA] precursor [investigation] and the others addressed in the FHA [suit] were part of a 'series of related' facts or transactions," in "virtually the same time period and revealed the same kinds of systematic lax underwriting practices." But as the district court correctly held, the differences are not only significant but determinative. The FHLA suit was a securities action concerning the prospectuses of mortgage-backed securities sold to Fannie Mae and Freddie Mac, whereas the current FHA suit concerns the underwriting and quality control requirements for HUD loans. The FHLA suit did not involve any HUD loans, much less the particular "wrongful acts" at issue here.

This challenge is without merit.

## D.

The Insurers also argue that First Horizon acted in bad faith, in violation of Tennessee Code § 56-7-106 (titled "Action brought in bad faith by policyholder"), when it sued to compel coverage after "g[iving] the Insurers [only] 48 hours to respond [to its claim and demand for $50 million in coverage], even though it [had] (a) secretly decided months earlier [that] it would make such a

settlement offer, and (b) inaccurately told the Insurers [less than a month earlier,] in January 2015 (and previously) that no such demand existed."

The issue, however, is whether "the action of the policyholder *in bringing the suit* was not in good faith," T.C.A. § 56-7-106 (emphasis added), and, even accepting the factual accusations as true, the Insurers do not show that First Horizon *filed the lawsuit* in bad faith. In fact, that is not even their argument. The Insurers actually argue that First Horizon hid the Government's demand (and settlement offer) from them, planned and negotiated without their input or knowledge, and only alerted them at the last moment—such that "[t]hese are not the actions of an insured cooperating with its insurers in good faith,"

Because this has no bearing on the filing of the lawsuit, this challenge fails.

## IV.

For all of the foregoing reasons, we AFFIRM the judgment of the district court.